**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**BRENDA ANN MANOS,**

     **Plaintiff,**

**vs.**                     **Case No. 1:15cv82-MP/CAS**

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security,**

     **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned magistrate judge for a

report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D). It

is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final

determination of the Acting Commissioner of the Social Security Administration (SSA)

denying Plaintiff's applications for a period of disability and Disability Insurance Benefits

(DIB) and Supplemental Security Income (SSI). After careful consideration of the

record, it is recommended that the decision of the Acting Commissioner, hereinafter

referred to as the Commissioner, be affirmed.

## I. Procedural History

On November 8, 2010, Plaintiff, Brenda Ann Manos, filed an application for DIB

pursuant to Title II of the Social Security Act (Act). Tr. 19, 156-64. (Citations to the

transcript/administrative record, ECF No. 13, shall be by the symbol "Tr." followed by a

page number that appears in the lower right corner.)   On April 19, 2013, Plaintiff also

applied for SSI benefits pursuant to Title XVI of the Act.   In both applications, Plaintiff

alleged disability beginning January 1, 2005, due to bipolar disorder, depression,

tendinitis, and anemia.   Tr. 19, 158, 188, 192.   For DIB purposes, Plaintiff's last date

insured was September 30, 2005.   Tr. 19.

Plaintiff's claims were denied initially on February 3, 2011, and upon

reconsideration on November 17, 2011.   Tr. 19, 68-96.   On January 18, 2012, Plaintiff

requested a hearing.   Tr. 19, 97-98.   On May 9, 2013, an evidentiary, video hearing

was held and Plaintiff appeared in Gainesville, Florida, and Administrative Law Judge

(ALJ) Lisa B. Martin presided from Jacksonville, Florida.   Tr. 19, 37-67.   Plaintiff was

represented by Pamela C. Dunmore, an attorney.   Tr. 19, 37, 145-48.   Plaintiff

testified.   Tr. 19, 43-61.   Donna P. Mancini testified by telephone as an impartial

vocational expert.   Tr. 19, 39, 62-66, 116-17 (Resume).

At the outset of the hearing, it was stated that Plaintiff had filed an application for

SSI on April 19, 2013, and that it was expedited for consideration.   Tr. 40.   Plaintiff's

counsel recognized "the lack of evidence back in 2005," which had been explained to

Plaintiff.   *Id.*   The ALJ inquired whether Plaintiff intended to amend her onset date, but

left the decision to Plaintiff's counsel.   Tr. 40-41.   The ALJ stated that Plaintiff's

counsel could amend the onset date after the hearing.   Tr. 41.   "[B]ased upon the new

Title XVI application, the lack of evidence back in 2005," counsel requested a "more up-

to-date consultative mental health examination.   Especially, in light of, your honor, the

possible amended onset date which, your honor, we will amend to the SSI application

[April 13, 2013].   It just makes sense."   Tr. 41-42.   The ALJ stated that she would

"consider the request for a psychological C.E."   Tr. 42.   Plaintiff's counsel advised that

she had ordered additional records from Shands Hospital Family Medicine and the

Health Department reflecting recent treatment.   *Id.*   The ALJ gave counsel ten days to

submit additional medical records.   *Id.*   Additional records were submitted after the

hearing, which appear in the record as Exhibits 15F through 19F, Tr. 567-749.   *See* Tr.

43 (ALJ admitting Exhibits 1A through 4A, 1B through 17B, 1D through 7D, 1E through

13E, and 1F through 14F).

Toward the end of the hearing, Plaintiff's counsel provided a closing argument

and the ALJ responded:

> ATTY: Your honor, we would just ask that you find the claimant's testimony
> credible.   Your honor, we also realize that in light of the lack of evidence during
> the relevant time period to which we've amended the onset date, your honor, we
> realize that there needs to be additional workup, your honor.   Your honor, we'd
> also like to reserve the right that if once you receive the additional evidence, your
> honor, if we would need to hold a supplemental hearing to possibly ask the
> vocational expert any additional questions.   We'd ask that we are allowed that
> right, your honor.   But, your honor, we believe –
>
> ALJ: Okay, well I'll – yeah, I'll consider that request to as well as the
> psychologicals that you requested.   At this point, now the record is going to stay
> open and you get those updated records and then I'll make a decision about
> those.

Tr. 66.

On July 31, 2013, the ALJ entered her decision concluding that Plaintiff is not

disabled.   Tr. 19-30.   In her decision, the ALJ stated, in part:

> <u>Of note</u>: At the hearing, the claimant's representative requested a consultative
> mental health examination as well as a supplemental hearing subsequent to the
> submission of additional medical evidence.   However, the request is denied.
> The claimant's representative also mentioned amending the alleged onset date

of disability; however, a written request has not been submitted, and the claimant
has not acknowledged that she understands the consequences of amending the
alleged onset date.

Tr. 27.

On September 11, 2013, Plaintiff filed a request for review of the ALJ's decision.

Tr. 14-15.   On February 26, 2015, the Appeals Council denied Plaintiff's request for

review.   Tr. 1-3.   The ALJ's decision stands as the final decision of the Commissioner.

*See* 20 C.F.R. § 404.981.

On April 27, 2015, Plaintiff filed a complaint requesting judicial review of the

Commissioner's final decision.   ECF No. 1.   Both parties filed memoranda of law, ECF

Nos. 16 and 18, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1.  "The claimant meets the insured status requirements of the Social Security
    Act through September 30, 2005."   Tr. 21.

2.  "The claimant has not engaged in substantial gainful activity since January 1,
    2005, the alleged onset date."   *Id.*

3.  "The claimant has the following severe impairments: lumbar spine disorder,
    wrist tendonitis, depression, bipolar disorder, anxiety related disorder, and
    history of alcohol and cocaine abuse."   *Id.*

4.  "The claimant does not have an impairment or combination of impairments
    that meets or medically equals one of the listed impairments in 20 CFR Part
    404, Subpart P, Appendix 1."   Tr. 22.

5.  "[T]he claimant has the residual functional capacity [RFC] to perform light
    work is defined in 20 CFR 404.1567(b) and 416.967(b) except not requiring
    ladder, rope, or scaffold climbing, not requiring constant upper extremity
    handling or fingering tasks, allowing claimant to avoid dangerous work
    hazards (unprotected heights and exposed machinery), and avoid crowded
    work settings.   The claimant is limited to routine, uncomplicated tasks not

requiring detailed decision making, not requiring a production rate pace, and not requiring more than occasional work interactions with coworkers, supervisors, and the public."[1]   Tr. 23-24.

6.   "The claimant is capable of performing past relevant work as a Housekeeper, Maid.   This work does not require the performance of work-related activities by the claimant's [RFC]."   Tr. 28.

7.   "Although the claimant is capable of performing past relevant work, there are other jobs existing in the national economy that she is also able to perform" such as Marker, Router, and Collator Operator, each classified as light, unskilled with an SVP of 2.   Tr. 28-29.

8.   "The claimant has not been under a disability, as defined in the Social Security act, from January 1, 2005, to the date of this decision."   Tr. 29.

## III.   Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance.   It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).   "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[2]

---

[1]   "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."   20 C.F.R. § 404.1568(a).   An SVP of 2 means "[a]nything beyond short demonstration up to and including 1 month." DOT (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP. In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."   20 C.F.R. § 404.1567(b).
[2]   "If the Commissioner's decision is supported by substantial evidence we must

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).[3]

---

affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

[3] The relevant DIB and SSI regulations are virtually identical. As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599, unless a SSI regulation provides otherwise. The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, e.g., 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).   In addition, an individual is entitled to DIB if she is under a disability prior to the expiration of her insured status.   *See* 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.   20 C.F.R. § 404.1520(a)(4)(i)-(v):

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have the residual functional capacity (RFC) to perform work despite limitations and are there any impairments which prevent past relevant work?[4]

5. Do the individual's impairments prevent other work?

---

[4]   An RFC is the most a claimant can still do despite limitations.   20 C.F.R. § 404.1545(a)(1).   It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.   *Id.*   The responsibility for determining claimant's RFC lies with the ALJ.   20 C.F.R. § 404.1546(c); *see* Social Security Ruling (SSR) 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term "*residual functional capacity assessment*" describes an adjudicator's finding about the ability of an individual to perform work-related activities.   The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.").

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.   A positive finding at step three results in approval of the application for benefits.   At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.   If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.   If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.   Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v).   If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.   Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

Plaintiff bears the burden of proving that she is disabled, and consequently, is responsible for producing evidence in support of her claim.   *See* 20 C.F.R. § 404.1512(a); Moore v. Barnhart, 405 F.3d at 1211.   On the other hand, an ALJ has a clear duty to fully and fairly develop the administrative record.   Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995); 20 C.F.R. § 404.1516(d).   The question here is whether there are "the kinds of gaps in the evidence necessary to demonstrate prejudice" to Plaintiff.   Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997).

Case No. 1:15cv82-MP/CAS

IV.  **Medical Evidence**

A.  **Plaintiff's Age, Education, and Work Experience**

Plaintiff was 47 years of age on the date of the ALJ's decision.   Tr. 28.   She had

a limited education and is able to communicate in English.   Tr. 193.   She has past

work as a housekeeper, maid, and janitor.   Tr. 28, 62.

B.  **Relevant Medical Evidence**

1.  **Mental Status**

The earliest records in the administrative file are dated July 2003.   At that time,

Plaintiff was hospitalized at Meridian Behavioral Healthcare, Inc. (MBHC) for a BA-52

for evaluation of suicide due to an overdose on Allegra.   Tr. 460.   (One note states that

Plaintiff believed she was wrongfully hospitalized.   Tr. 453, 457.)   It was suspected

that she took five or six tablets, which prompted her emergency room visit.   Tr. 452.

Upon admission she was noted to be acceptably dressed and groomed.   She

maintained direct eye contact, had appropriate mood behavior and was cooperate,

friendly, and attentive during the evaluation.   Her speech was appropriate and

judgment was good.   She did not appear to have delusions and her perception was

intact.   Her thought processes were organized, coherent, and goal-directed.   She was

oriented to person, place, time, and situation.   Her memory was intact as was her

concentration, abstraction, and problem-solving.   She had a normal/broad affect.   Her

mood was described as unremarkable and angry.   She was found to have no evidence

of suicidal risk assessment.   Plaintiff had a low risk of suicide.   Tr. 452-61.   The

diagnostic impression was deferred and <u>Global Assessment of Functioning</u> (GAF)

scores of 50 (current) and 60 (highest past year) were diagnosed.[5]   Plaintiff's prognosis

was guarded.   Tr. 446, 448, 450.

On July 6, 2007, Nancy K. Duke, MSW, ACSW, with MBHC, performed a mental

health evaluation as a court-ordered condition of her probation.   Tr. 446, 448, 450.

Plaintiff was diagnosed with Depressive Disorder, not otherwise specified (NOS),

---

[5]   The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF Scale that is primarily used by mental health practitioners.   The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." DSM-IV-TR 32-34.   The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale.   *Id.   See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale).   A score of 31-40 is defined as manifesting "[s]ome impairment in realty testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."   DSM-IV-TR at 34.   A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning.   *Id.*   A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.   *Id.*   A GAF scale rating of 61 to 70 indicates some *mild* symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.   *Id.*   The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"   Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).   In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice. In order to provide a global measure of disability, the WHO DSM-5 (*see* the chapter "Assessment Measures")."   DSM-5 at 16; *see* Finley v. Colvin, Civil Action No. 3:12-7908, 2013 WL 6384355, at *23 n.9 (S.D. W.Va. Dec. 5, 2013) ("It should be noted that in the latest edition of the [DSM], the GAF scale was abandoned as a measurement tool.").

Alcohol Abuse, in partial remission. Tr. 444. Ms. Duke also noted that Plaintiff had unresolved relationship and self-esteem issues from her own history of abuse. Plaintiff reported ongoing problems with falling asleep, decreased appetite, decreased energy, and other neuro-vegetative symptoms of depression (poor concentration, worthlessness and passive thoughts of dying). Her memory was intact, but she experienced some cognitive deficits. Ms. Duke opined that Plaintiff may have some level of learning disability. She was found to have some insight and her judgment was fair. It was recommended that she continue outpatient mental health counseling, pursue psychiatric treatment, and take all medications as prescribed. She was encouraged to continue to sobriety that should be monitored with random drug screens. Tr. 446, 448, 450. She had a GAF score of 55 and prognosis was fair. Tr. 444.

Beginning August 2007, Plaintiff treated with MBHC on an outpatient basis. Tr. 436; *see* Tr. 424 (court-ordered treatment). She reported an ongoing history of Ethyl Alcohol (ETOH) usage and was currently trying to abstain. She reported the following associated symptoms/problems during her usage of alcohol: increased tolerance; passing out; blackouts; hangovers; lengthy intoxication; hallucinations; depression; anxiety; increased guilt; personality changes; sleep disturbance; changes in eating habits; loss of other interests; verbal fights; promise to stop; avoiding family/friends; social problems; spiritual changes/conflicts; and sexual problems. Tr. 436. She perceived she was "an alcoholic." Tr. 437. She reported a prior diagnosis of "dyslexia, learning disorder." Tr. 432. Her GAF score was 60. Tr. 430; *see* Tr. 425-27 (generally normal mental status exam).

On March 24, 2008, Plaintiff was diagnosed as suffering with Mood Disorder, NOS and Bipolar Disorder, NOS.  Tr. 363.  She was on probation.  Tr. 361.  She was assessed a GAF score of 60.  *Id.*  It was recommended that she stop using ETOH and when not drinking, instructions and treatment for her mood disorder would begin.  Tr. 363.  A treatment plan note of April 23, 2008, noted that Plaintiff was still depressed and regularly attending out-patient management at Bridgehouse for ETOH abuse and anger management.

In May 2008, Plaintiff was started on Prozac 20mg and Trazadone 100mg.  Her judgment and insight were good; speech, normal; manner, appropriate; mood was "pretty good"; affect was blunted; and thought process was linear and goal oriented. Tr. 355.  In June 2008, Plaintiff reported that she believes that someone put something in her drink and she was sexually abused.  She denied using cocaine or cannabis. She reported depression, but denied suicide.  Her medications were refilled.  Tr. 355.

On July 9, 2008, Plaintiff requested inpatient treatment for alcohol abuse. Tr. 351.  Her mood at the time of examination was "sluggish" and her affect was "confused."  Insight and judgment were good.  She reported that she hears her inner thought about her past mistakes and felt people judge her.  Prozac was increased to 40mg and Trazadone 100mg was refilled.  It was recommended that she contact Bridgehouse for possible inpatient treatment.  *Id.*

By August 15, 2008, Plaintiff's prognosis was "guarded" and she had a GAF score of 47.  Tr. 420, 422.  At this point, she presented for detox voluntarily for help for alcohol and cocaine issues.  Tr. 470.  She also reported having continued issues with

depression and anxiety and was prescribed Prozac and Zoloft with regular appointments with Drs. Williams and Adu.   On-site drug screening showed negative results for all substances, however, Plaintiff reported "routine use of Alcohol and Cocaine."   Tr. 420.   She was to begin out-patient treatment on August 18, 2008.   *Id.* Plaintiff was referred for residential treatment and it was recommended she participate in an intensive outpatient treatment program.   Tr. 422.

On October 2, 2008, Plaintiff became ASAM eligible for level-2 inpatient care provided at the Bridgehouse Residential Program.   Tr. 402.   She had a GAF score of 38.   Tr. 404.   Consideration of Plaintiff's interpersonal relationships was deferred at this time, however, the writer noted that Plaintiff described being physically and emotionally abused by her mother.   Tr. 402.   She related that her mother would hit her with an extension cord or brooms.   Her mother's abuse included name calling such as "bitches and whores, and stupid."   She also reported being sexually abused by an uncle from the age three until she was seven years old.   *Id.*   She reported no contact with her mother, but does not know why.   She rated her dependence on alcohol about a seven out of ten.   Tr. 400.

By February 2009, Plaintiff reported no alcohol use and that she was attending AA meetings.   She reported that she was sleeping well.   Her GAF score increased to 60.   Tr. 370.   Plaintiff renewed her feelings of being judged by others on February 11, 2009.   Tr. 349.

On October 14, 2009, Plaintiff was noted to have complied with treatment requirements and did not miss any appointments since her last treatment plan update. Medications included: Prozac and Abilify. (Plaintiff was last seen in March 2009. Tr. 346-47, 364.) She reported some muscle stiffness and cramps. Plaintiff noted some improvement with medications, but was still having trouble with depression and anxiety. Tr. 342-45, 364. The doctor diagnosed Plaintiff with: Bipolar Type II; GAD (Generalized Anxiety Disorder); RIO Panic attack disorder with agoraphobia; and alcohol dependence in full sustained remission. She had a GAF score of 58. Tr. 345. As ordered, Plaintiff attended monthly treatment and medication management treatments until January 2010. Tr. 336-41.

Plaintiff returned for treatment at MBHC on August 24, 2010. She reported she was arrested on April 17, 2010, for possession of cocaine and was incarcerated from April 2010 until June 2010 and placed on probation for two years. Tr. 394. She was seeking voluntary treatment for substance abuse therapy. She endorsed the following symptoms: depression (lonely, sad, worthless, depressed mood, sleep problems); anxiety (guilt, anxious, fearful, tense, panic); hyper affect (agitated, overactive, sleep deficit; thought process (paranoid); cognitive performance (poor memory, oriented X 4); traumatic stress (upsetting memories, dreams/nightmares, avoidant). Her medical diagnosis was Bipolar Disorder, NOS, and alcohol dependence. At this time, she had a GAF score of 50. Tr. 390, 392.

On December 6, 2010, Plaintiff returned to MBHC as a "walk in." Tr. 509. She reported she had not used cocaine or ETOH and denied substance abuse. *Id.*

Plaintiff continued treatment with MBHC in 2011.   Tr. 495-508, 523-40, 542-66.
Mental health treatment has continued to focus on treatment of her Bipolar II Disorder,
Tr. 497, 504, 525, 531, 535, 538, 540, and alcohol dependence and post-traumatic
stress disorder.   Tr. 504, 531, 535, 538, 540.

In January 2011, Plaintiff's medications were modified to include Topamax to
assist with ETOH cravings and weight loss.   She had a relapse to drink.   Tr. 537.   Her
insight and judgment were fair.   Tr. 538.

On March 14, 2011, Plaintiff reported having anxiety attacks once in a while; "not
too much."   Tr. 536.   She denied craving ETOH.   She had no side effects from
medications; her sleep was great.   *Id.*   By June 8, 2011, it is reported that Plaintiff was
no longer on probation, although she had a relapse a month prior and spent three days
in jail.   Tr. 533.   On August 24, 2011, Plaintiff requested to be placed back on
Topamax to reduce her craving for ETOH.   Tr. 531.   Her mood was good most of the
time; full affect; organized thought process; she denied homicidal or suicidal ideation;
her insight and judgment were fair.   She was continued on Prozac 20mg, started on a
medication (illegible), but discontinued Seroquel, and another medication was added for
her craving.   Tr. 532.

A discharge/transfer summary from an MBHC notes a discharge/transfer date of
April 18, 2012.   Tr. 553.   It is noted that Plaintiff was admitted on December 5, 2011.
*Id.*   There are detailed notes indicating that Plaintiff "continue[d] to demonstrate an
attitude about taking responsibility for her actions (i.e., as evidenced by demonstrating
snapping at others on this morning)."   It was concluded that it was "not appropriate for

[Plaintiff] to continue services in CARE at this time. [Plaintiff] was instructed to seek counseling through the Alachua County Crisis Center and to increase her AA/NA support group attendance in order to work on her recovery." Tr. 554. Plaintiff was advised "that she may return for an assessment and consideration for readmission to CARE after a minimum of 30 days." *Id.* Plaintiff's GAF score was 55 and she was diagnosed with alcohol dependence. Her prognosis was poor. Psychosocial and environmental problems are described as "low level of education/dropped out" and "divorce." *Id.*

On July 27, 2012, Plaintiff reported to MBHC that she had medical side effects which included dizziness, nausea, headaches, and swollen eyes. Tr. 545. She also reported sleeping good; medication compliance; no drug or tobacco use, but drinking one to two beers a week; and no missed appointments or CSU admits in the last six months. She was eating three meals a day plus snacks. Diagnosis was mood disorder, NOS. Her GAF score was 51. *Id.*

Plaintiff was referred to the State of Florida Department of Education – Vocational Rehabilitation by the We Care program with her local health clinic. Tr. 567-71. On April 10, 2012, Jeff Gedney, Psy.D., a clinical psychologist, performed a diagnostic evaluation with psychological testing for the purposes of assisting in an eligibility determination and for providing individual services. Tr. 567; *see* Tr. 26 (ALJ's discussion of Dr. Gedney's evaluation). She presented on time, was neatly dressed, well-groomed and with good hygiene. She was pleasant and cooperative and provided moderately detailed history which was somewhat circumstantial. There was some

suggestion of affirmative responding, offering replies consistent with what she anticipated the evaluator was looking for. She was found to have poorly defined employment goals and presented as somewhat skeptical regarding employability given her advertised physical limitations. Dr. Gedney noted that she "probably" had low average intelligence, but had good common sense, given her fourth grade education. *Id.* Her insight and judgement, emotional regulation, impulse control, planning, and forethought were normal. Her mood and affect were pleasant and cooperative with reasonably bright and appropriate variable affect. "There was no evidence of unusual ideations or thoughts and no evidence of significant psychopathology such as hallucinations, delusions or difficulty with reality testing." *Id.*

Plaintiff reported that she was removed from school after the fourth grade to help support the family following the death of her father. "She has attempted subsequent schooling but repeatedly discontinued because of various personal interruptions. This has included her pursuing her GED as well." *Id.* She reported having basic reading skills which were briefly verified during the evaluation, confirming that she was able to appropriately read and comprehend self-report questions which were written at an eighth-grade level. Tr. 567-68. She stated that her spelling was exceedingly poor, but that she had relatively solid math skills. She denied attending any form of vocational or on-the-job training. Tr. 568.

Plaintiff reported that her most recent employment was with her husband at that time, working their joint custodial business between 2003 and 2008. *Id.* She left the job after their divorce because of her ex-husband. "Employment efforts since 2008

have included applying for kitchen service work through the local school board and for custodial work at the local Job Corps. She was declined for both because of her physical limitations." *Id.*

Plaintiff reported pain in the ball of both feet with the right foot occasionally swelling preventing her from wearing a shoe. She also reported occasional flares of ovarian cysts, requiring addressing through the emergency department visits. She reported having bilateral hand pain with occasional swelling since 2008 and she continuously wears wrist braces. She stated that she had a provisional diagnosis of tendonitis. She complained of weak grip strength with loss of sensation and fine motor control of fingers. She also reported that she treated for hypertension, receiving her care through a local charity clinic (We Care), with analgesics consisting of muscle relaxers. *Id.*

Dr. Gedney noted that Plaintiff has received mental health services since 2004 with a diagnosis of bipolar. He noted that she has also had a long-standing history of cocaine and alcohol dependence with a voluntary 30-day residential rehabilitation placement (Bridgehouse) in 2007. Relapses have been associated with repeated jail terms and subsequent intensive outpatient treatment which is ongoing, five days per week, in addition to AA attendance three to four days per week. She was also found to receive individual therapy as well as group therapy through her intensive outpatient treatment (Bridgehouse) and a psychiatrist at MBHC. She disclosed a history of sexual abuse by her uncle at the age of seven and emotional/physical abuse by her mother as a child. Plaintiff has a valid driver's license, but relies on public transportation, resides

in an apartment with assistance from her ex-husband and receives $200.00 in food stamps monthly. Tr. 569.

All functional day-to-day activities were intact, however, she reported interference from pain-related limitations (e.g., reduced frequency of laundering and cleaning, cooks for several meals at once). Tr. 569. She was noted to have no significant social relationships, primarily by choice because of trust issues and to support her sobriety. *Id.*

The self-reported inventory, Assessment of Pathology (Million Multidimensional Personality Inventory (MCMI-III), "response profile was adjusted for a broad tendency to magnify illness, difficulties or legitimize struggles." Dr. Gedney noted that Plaintiff's "deep-rooted distrust in others is reflected in both judgment to feelings and attitudes of others and her defensive mannerisms which may present as paranoid traits." Tr. 569-70. Dr. Gedney believed that she has difficulty making sense and responding in a stable fashion to a myriad of feelings and emotions. Tr. 570. Her poor insight and emotional grounding contributes to fatalistic beliefs and attitudes, presenting a depressed mood and chronically heightened arousal. *Id.*

The Personality Type (Million Adolescent Personality Inventory (MAPI), was found to be valid. *Id.* The Personality Style (16 Personality Factor (16PF, Version 5) indicated that Plaintiff was very uncomfortable working in direct and or close interaction with others, preferring instead to be extremely self-reliant. She has tendency to be very vigilant and questioning of the motives of others may escalate to emotional reactivity if she perceives that she is being targeted or singled out in some way. *Id.*

Dr. Gedney's summary included the following observations: "Psychological test interpretation is congruent with clinical impressions and history, suggesting that this is an individual with poor self reflective insight and grounding and whose distrust and discomfort with others leads to avoidance to minimize potential conflict." *Id.* Dr. Gedney's diagnostic impression was: Major Depressive Disorder, Recurrent, Moderate (with questionable psychosis); Alcohol Dependence in Full Sustained Remission and Cocaine Dependence in Fully Sustained Remission "(each >6 months per client report)"; Personality Disorder NOS with borderline traits. He provided a GAF score of 45. Tr. 570-71. Dr. Gedney opined, in part, that Plaintiff should continue to pursue disability benefits as her ability for securing and maintaining gainful employment, let alone her questionable motivation, raises concerns regarding her capacity for productivity utilized by VR services. "An extended work evaluation to help elucidate employment capacity is indicated given her substance use history, reported debilitating pain and expressed discomfort interacting with others." Tr. 571.

On January 24, 2013, Plaintiff reported to MBHC that she was experiencing side effects from her medications. Tr. 542. Specifically, she reported some progress with medication and medication compliance. Notwithstanding, Topamax was causing difficulty sleeping. Her appetite increased and she found she was gaining weight. She also reported that the Topamax was causing restless and the Seroquel was causing over sedation. She also reported that she is hearing voices in her head and that she was seeing shadows moving. Her medical diagnosis at this time was Major

Depressive Disorder, recurrent, severe with psychotic features.   She had a GAF score

of 49.   *Id.*

On February 28, 2013, a therapist at MBHC noted that Plaintiff went to rehab for

ETOH.   Tr. 556.   A note states that Plaintiff's last drink was in March 2012.   *Id.*   Her

mood was "pretty good."   Though process was unremarkable; thought content was

appropriate; she expressed no suicidal or homicidal ideation; her insight and judgment

were good.   She was diagnosed with Mood Disorder, NOS and ETOH dependence in

remission.   *Id.*

### 2.   Physical Status

Physically, Plaintiff was seen by Southeastern Primary Care in April 2008.   She

complained of bilateral hand swelling tenderness of the elbows and hands.   Tr. 321;

*see* Tr. 25-26 (ALJ's discussion of Plaintiff's physical issues).   She was diagnosed with:

tendonitis elbows much improved; herpes simplex resolved for now; and sleep problems

and fatigue.   Tenderness of the joints was noted, but found to be much improved.   She

was instructed to continue ice, exercises and splints.   She was prescribed Elavil 25mg.

Tr. 320.   William Warrick, III, M.D., with Southeastern Primary Care also diagnosed

Plaintiff with GERD and possible gastroparesis in December 2009.   Dr. Warrick found

tenderness to the abdomen.   Tr. 317-18.   Lumbar spine x-rays performed in August

2007 revealed lumbar spine levoscoliosis and mild multilevel spondylosis.   Tr. 309.

Plaintiff underwent a transabdominal/transvaginal pelvic ultrasound in July 2007 with a

comparison of February 2007.   The study found: 1) two uterine fibroids involving the

anterior and posterior body of the uterus with the posterior myoma being the larger

measuring 2.2 cm size appearing similar to the comparison study.   This fibroid abuts

and probably causes mass effect upon the adjacent endometrium; 2) normal

morphology of both ovaries; and 3) small amount of nonspecific free fluid identified

within the central canal of the uterus.   Tr. 309.   Right wrist x-rays performed in October

2007 revealed questionable malalignment of distal radioulnar joint.   Tr. 308.

   In June 2011, Dr. Warrick diagnosed Plaintiff with asthma/bronchitis and

gastroenteritis.   He prescribed Advair disc 250, Mucinex DM, Culturelle, and

Promethazine 25 mg.   Tr. 519.   The doctor also diagnosed arthralgias of toes and

fingers in July 2011.   Tr. 517.   From August 2010 to February 2011, Plaintiff obtained

medical care with the Alachua County Health Department.   Tr. 480-93.   Plaintiff

treated for multiple conditions including sore throat, shingles and eye pain.   *Id*.

   On January 26, 2011, Plaintiff received services at Shands at UF Emergency

Department (Shands) for conjunctivitis and shingles.   R. 581.   Her mental status was

appropriate for her age.   She was awake, alert, and cooperative; her mood and affect

were normal.   Tr. 574; *see* Tr. 586-97 (Jan. 2012, emergency department visit at

Shands for leg pain); *see also* Tr. 591 (normal psychosocial assessment).   On August

28, 2011, Plaintiff represented to Shands complaining of eye pain.   Tr. 632-44.   A

psychosocial assessment noted that she had no current complaints.   Tr. 639.

   Right leg x-rays performed on January 2012 revealed 4.4 cm calcific or ossific

density within the soft tissues posterior to the distal femur.   Tr. 594.

   On March 16, 2012, Plaintiff established care with University of Florida

Physicians (UFP) in Gainesville, Florida.   Tr. 744.   It is noted that her Bipolar I

Disorder was well controlled on Prozac and Seroquel. Tr. 746. In April 2012, Plaintiff follow-up with UFP and reported her pain worsened with reaching overhead. No other complaints or concerns are noted. Tr. 741. In May 2012, Plaintiff visited with UFP and complained of congestion. Tr. 738. In June 2012, Plaintiff reported she continued to have burning in her chest with metallic taste in the back of her throat.

Tr. 735. She also complained of right elbow pain. She was assessed with having GERD (gastroesophageal reflux disease). Tr. 736-37; *see* Tr. 720-34 (June- Sept. 2012, visits with UFP). In October 2012, Plaintiff presented UFP as a follow-up for joint pain in her hands and a rash on her neck. Her Bipolar I Disorder was noted to appear "uncontrolled" and she was advised to make an appointment with MBHC. She reported being tearful and emotional since her grandchild died and needed to go to the emergency department for a recent panic attack. Tr. 716; *see* Tr. 718 (Oct. 1, 2012, visit with UFP-"Psychiatric[:] A&O x3, with mood and affect appropriate for situation.").

In November 2012, Plaintiff presented to UFP for right hand and wrist pain and a follow-up for anxiety. Her Bipolar I Disorder was noted as stable and she was to continue with MBHC. She was reported to be back on Seroquel. Topamax, and Celexa. "Patient states anxiety and nerves are significantly better than at her last visit." R. 714. In December 2012, Plaintiff presented to UFP as a follow-up for bronchitis. Tr. 710-13. In January 2013, Plaintiff presented to UFP, complaining of allergies, tendonitis, and medication. Tr. 707-09. In April 2013, Plaintiff presented to UFP complaining of hypertension and GERD. R. 702. In March and April 2013, her mood, affect, and thought content were normal. Tr. 703, 705.

### 3. Plaintiff's Hearing Testimony

The ALJ considered Plaintiff's hearing testimony.

At the hearing, the claimant testified that she experiences depression and panic attacks. The claimant testified, "I can't stand crowds." The claimant testified that she see [sic] shadows around the house. The claimant testified that she lives with her daughter and two grandchildren, ages two and four. Claimant testified that her highest level of education is the 4th grade; however, the claimant noted that she is able to read, write, and perform simple mathematics (see also Exhibit 4F/127).

The claimant testified that she attends Meridian Behavioral Healthcare twice per month. The claimant testified that the mental health symptoms affect her ability to concentrate and perform job tests. The claimant testified, "My mind wanders sometimes and I can't focus on the things I need to do." Claimant testified that she experiences hallucinations "every day." The claimant also noted that she has trust issues.

The claimant testified that she began taking medication for tendinitis in 2005. Claimant noted that her hands hurt when she grips an item, as though the "bone is slipping from the wrist." The claimant testified that she attended physical therapy at Shands in 2005. Claimant testified that she has received treatment off-and-on through the years for tendonitis, due to cost constraints. The claimant presented to the hearing with splints, noting that her hands/arms hurt constantly. Claimant testified that the splints help.

The claimant testified that medication side effects include drowsiness.

Tr. 24-25; *see* Tr. 43-61 (transcript of hearing testimony).

### 4. Vocational Expert's Hearing Testimony

The vocational expert testified that Plaintiff's past relevant work included work as a housekeeper, light and unskilled with as SVP of 2 and work as a cleaner, "just like the janitorial type position," medium and unskilled with an SVP of 2. Tr. 62; *see* Tr. 28, 271 (worksheet). The vocational expert was asked the following hypothetical question:

Assume individual with the claimant's age, education, and work background. For the first I'm going to start with the assumption the individual has no exertional limitations but would need to avoid ladder, rope, or scaffold climbing. Will need

to avoid exposure to dangerous work hazards which would be unprotected heights and exposed machinery. They need to avoid exposure to crowded work settings. They need to have work that is routine and uninvolved in complexity, not requiring detailed decision making, and not requiring any production rate pace. Finally, they need to avoid more than occasional required work interactions with co-workers, supervisors, and the public. So, for the first, how does that impact the claimant's past work?

Tr. 63-64. The vocational expert's response was "[INAUDIBLE]," but then recorded as

"remain within your hypothetical, your honor" to which the ALJ inquired further:

Okay so, if I had some exertional limitations and what I'm going to do now is have the individual limited to a full range of light work activities but they need to avoid constant upper extremity handling and fingering tasks. The rest of hypothetical number one remains. Can you identify jobs in the regional or national economy?

Tr. 64. The vocational expert responded:

Yes, your honor. I just want to check to see if the maid remains within the hypothetical. Cleaner, industrial would be eliminated because that is medium work. In the handling and fingering, handling for the cleaner, housekeeping is frequent, fingering is occasional. So, that position would remain within your hypothetical.

*Id.* The vocational expert agreed that the maid and housekeeper work would remain.

*Id.* The vocational expert identified other jobs that Plaintiff was capable of performing,

such as marker, router, and collator operator, each classified as light and unskilled with

an SVP of 2. The vocational expert testified that these are a representative sample of

light work within the ALJ's restriction. Tr. 64-65; *see* Tr. 29. The third hypothetical

included consideration of the individual being "off task" for 20 percent or more of the

work day. Tr. 65. The vocational expert opined that such an individual would be

terminated and no other work available. *Id.*

**V. Legal Analysis**

**Substantial evidence supports the ALJ's determination that Plaintiff is not disabled and not entitled to a remand to more fully develop the record.**

Plaintiff contends that "the sparse evidence establishes that [she] is severely

mentally ill and possibly retarded" and that the ALJ

> was aware that [Plaintiff] is alleging a marginal Fourth (4th) grade education. <u>See</u> Tr. 45 and 193. Yet, ALJ Martin failed to either "investigate the facts and develop the arguments both for and against granting benefits" or "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," ensuring that both favorable and unfavorable facts are elicited, by sending the [P]laintiff out for a mental status evaluation, which in turn would have triggered IQ testing.

ECF No. 16 at 13-14 (citations omitted).[6] Plaintiff contends that the ALJ should have

sent Plaintiff to a psychiatrist or psychologist for a mental health evaluation and to

further develop the record in order to determine whether Plaintiff's I.Q. was the reason

for her marginal education and that the ALJ committed reversible error because she

failed to fully and fairly develop the record in order to determine "whether the reason for

[Plaintiff's] marginal education is her I.Q. and whether her mental residual functional

capacity precludes full time employment."[7] ECF No. 16 at 15.

---

[6] The Commissioner notes that effective September 3, 2013, the term "mental retardation" was replaced with "intellectual disability." ECF No. 18 at 7 n.4. Notwithstanding this change, the Court will refer to the terminology used by Plaintiff.

[7] Plaintiff refers to part of the ALJ's "<u>Of note</u>" included with her RFC assessment, ECF No. 16 at 15. The entire statement follows:

> <u>Of note</u>: at the hearing, the claimant's representative requested a consultative mental health examination as well as a supplemental hearing subsequent to the submission of additional medical evidence. However, the request is denied. The claimant's representative also mentioned amending the alleged onset date of disability; however, a written request is not been submitted, and the claimant is not acknowledged that she understands the consequences of amending the

The Commissioner argues that substantial evidence supports the ALJ's disability determination and that the ALJ did not err when she decided the case on this record. ECF No. 18 at 3-8.

After determining that Plaintiff has not engaged in substantial gainful activity since her alleged onset date of January 1, 2005, which was not formally amended per the ALJ, *see supra* at 2-4 and n.7, the ALJ found that Plaintiff has several severe impairments including depression, bipolar disorder, anxiety related disorder, and a history of alcohol and cocaine abuse. Tr. 21. At step three, the ALJ determined that Plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments. Tr. 22. In making this determination, the ALJ determined that Plaintiff had *mild* restriction in activities of daily living, *moderate* difficulties in social functioning and with regard to concentration, persistence, or pace, and *no* episodes of decompensation, which have been of extended duration "(i.e., at least two weeks in duration)." Tr. 22-23. The ALJ further stated:

> Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.
>
> The undersigned has also considered whether the "paragraph C" criteria are satisfied. There is no evidence in the record of a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support in one of the following: (1) repeated episodes of decompensation, each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment

---

alleged onset date.

Tr. 27; *see supra* at 2-3.

Case No. 1:15cv82-MP/CAS

that even a minimal increase in mental demands or change in the environment
would be predicted to cause the individual to decompensate; or (3) current
history of 1 or more years' inability to function outside a highly supportive living
arrangement, with an indication of continued need for such an arrangement.

Tr. 23. The ALJ noted that the limitations identified in the "paragraph B" criteria are not

an RFC assessment, "but are used to rate the severity of mental impairment at steps 2

and 3 of the sequential evaluation process." *Id.* The ALJ further noted that her RFC

determination reflected "the degree of limitation [she] found in the "paragraph B" mental

function analysis." *Id.*

As part of her RFC analysis and relevant here, the ALJ considered the evidence

related to Plaintiff's mental impairments.

Turning to the claimant's mental impairments, the claimant has a history of
depression (Exhibit 4F), and in July 2003, a Baker Act was initiated to rule out
suicidal ideation. An Axis I diagnosis was deferred, and the claimant was
assigned a global assessment of functioning (GAF) of 50 (Exhibit 4F/139-140).
Thereafter, in July 2007, the claimant was referred for a mental health evaluation
as a Court ordered condition of her probation. Therein, the claimant noted that
she is currently under the psychiatric care of Dr. Gary Gossinger for the
treatment of depression. The claimant reported a two-month history of
treatment, with positive results (Exhibit 4F/ 125). The mental status examination
was relatively benign, with the exception of a possible cognitive deficit.
Following the examination, the diagnostic impression was Depressive Disorder
NOS an Alcohol abuse in partial remission. Continued outpatient mental health
counseling was recommended (Exhibit 4F/ 127-129)

On April 10, 2012, the claimant was referred for a diagnostic evaluation with
psychological testing by Vocational Rehabilitation. Therein, the claimant stated
that she has a valid driver's license but relies on public transportation. The
claimant noted that all functional day-to-day activities are intact; however, she
has some pain related limitations, inducing a reduction in the frequency of
laundering, cleaning, and cooking. The claimant stated that she attends church
weekly and AA meetings three to four times a week (Exhibit 15F). The claimant
reported a long-standing history of cocaine and alcohol dependence with
previous residential rehabilitation and ongoing intensive outpatient rehabilitation
with individual and group counseling and psychiatric management since 2008
(Exhibit 15F).

Following the examination, the claimant was diagnosed with recurrent and moderate Major Depressive Disorder with questionable psychosis; Alcohol dependence in full-sustained remission; and Cocaine dependence in full-sustained remission. The Axis II diagnosis included Personality Disorder with borderline traits. The claimant was assigned a GAF of 45 (Exhibit 15F). In the report, Dr. Gedney noted that the claimant's ability for securing and maintaining gainful employment, as well as her questionable motivation, raises concern regarding her capacity for productively utilizing Vocational Rehabilitation resources (Exhibit 15F/5). The GAF score has been accorded some weight; however, the undersigned notes that the GAF score seems to be due to a history of substance abuse and pain complaints, rather than due to her mental disorder.

The record indicates that psychotropic medication has helped manage the claimant's symptoms (Exhibits 2F/5, 3F/5, 4F/21, 8F/12, 8F/15, 12F/14, and 14F/21). In March 2011, the claimant noted that her mood swings are stable and she is improving in her anger. The claimant noted that she has not had any recent anxiety attacks lately (Exhibits 8F/4 and 12F/4).

Although the record confirms the existence of the claimant's impairments, the record does not support a resulting inability to work. The claimant's medical complaints have been treated conservatively and the claimant's mental impairments are well controlled on medication (Exhibit 19F/23 and 19F/44). The claimant had full range of motion in the upper and lower extremities, and the motor and sensory exams were non-focal in January 2011 (Exhibit 16F/3).

There is limited medical evidence of record prior to September 30, 2005, the date last insured. As noted above, there are minor references to mental health issues prior to the date last insured. What is more, the record indicates that the claimant attempted to start her own home cleaning business in 2007 (Exhibit 4F/ 127). The record also indicates that the claimant had alcohol abuse during the time period under adjudication (Exhibit 8F).

The record indicates that the claimant worked after the alleged onset date of disability in a custodial business (Exhibit 15F/2). Thereafter, the claimant applied for kitchen service work and custodial work (Exhibit 15F/2). Although the custodial work was not performed at substantial gainful activity levels, it evidences a perceived willingness and ability to work.

Tr. 26-27.[8] The ALJ "accorded some weight" to the opinions of the State agency

---

[8] The ALJ also made detailed findings regarding Plaintiff's physical impairments, none of which are questioned by Plaintiff. Tr. 25-26.

medical consultants who reviewed the record initially and on reconsideration and

noted:

> As for the opinion evidence, the undersigned has considered the opinions of the State agency medical consultants who reviewed the record initially and on reconsideration (Exhibits 2A, 1F, 6F, and 13F). The doctors' opinions have been accorded some weight, as the doctors are disability specialists who reviewed the evidence of record and considered all of the objective facts at the time they rendered their opinion. However, giving the claimant some benefit of the doubt, the undersigned has included limitations to the [RFC] assessment as described above.

Tr. 27.

On November 16, 2011, Elizabeth Michalec, Ph.D., submitted a Psychiatric

Review Technique (PRT) on reconsideration and concluded that there was insufficient

evidence "to determine level of severity of the alleged mental impairments [.] We

would need a mental status exam as well as detailed qualitative and quantitative

functional data for the time period in question." Tr. 289 (Exhibit 1F); *see* Tr. 465-78

(Exhibit 6F) (Yamir Laboy, Psy.D., LMHC, Jan. 4, 2011, PRT, stating several diagnoses,

but inability to contact Plaintiff by telephone and correspondence and same regarding

attempts to contact the third party listed on the claim and, as a result, noting "insufficient

evidence in the file to make a determination"); Tr. 541 (Exhibit 13F) (Jorge Weksler,

M.D., Nov. 16, 2011, finding that "[t]here is no available medical evidence to properly

evaluate the cl's alleged physical impairments prior to DLI of 9/30/2005."); Tr. 69-78

(Exhibit 2A) (Aug. 4, 2011, initial level determination by Christine Tice, an SDM (single

decision maker) of "not disabled"). Also, on August 4, 2011, Pauline Hightower,

Psy.D., completed a PRT at the initial level of review, considered medical evidence pre-

dating her assessment, Tr. 72-74, and noted, in part, under the category "weighing of

opinion evidence," that "[t]here in no indication that there is medical or other opinion evidence."[9]  Tr. 74.   The reviewers, except Ms. Tice and Dr. Hightower, are in agreement that there was insufficient evidence at the time to render an opinion regarding Plaintiff's claim.

These State agency determinations pre-date the treatment notes in 2012 and 2013 and the initial psychosocial evaluation performed by Dr. Gedney on April 10, 2012. Tr. 567-71.   The ALJ summarized Dr. Gedney's findings, including his diagnoses:

> Following the examination, the claimant was diagnosed with recurrent and moderate Major Depressive Disorder with questionable psychosis; Alcohol dependence in full-sustained remission; and Cocaine dependence in full-sustained remission.   The Axis II diagnosis included Personality Disorder with borderline traits.   The claimant was assigned a GAF of 45 (Exhibit 15F).   In the report, Dr. Gedney noted that the claimant's ability for securing and maintaining gainful employment, as well as her questionable motivation, raises concern regarding her capacity for productively utilizing Vocational Rehabilitation resources (Exhibit 15F/5).   The GAF score has been accorded some weight; however, the undersigned notes that the GAF score seems to be due to a history of substance abuse and pain complaints, rather than due to her mental disorder.

Tr. 26; *see supra* at 16-20 (summary of Dr. Gedney's evaluation).   Although Dr. Gedney recommended, in part, that Plaintiff's "[m]edical records should be closely reviewed, or a physical exam completed, to help characterize her physical abilities and limitations before consideration of job placement," Tr. 571, and made several other recommendations, Tr. 571, none included having Plaintiff tested to determine whether Plaintiff "is severely mentally ill and possibly mentally retarded," *see* ECF No. 16 at 13,

---

[9]   The ALJ did not mention any of the State agency consultants by name, including Dr. Hightower, although she referred to Exhibit 2A that includes Dr. Hightower's PRT.   Tr. 27, 73-74.   Nevertheless, the ALJ gave Plaintiff "some benefit of the doubt" and "included limitations to the [RFC] assessment."   Tr. 27.   *See generally* <u>Edwards v. Sullivan</u>, 937 F.2d 580, 585 (11th Cir. 1991).

notwithstanding Dr. Gedney's knowledge of Plaintiff's 4th grade education, Tr. 567.[10]

In fact, Dr. Gedney noted Plaintiff's report

that her mother removed her from grade school after the fourth grade to help support the family following the death of her father. She has attempted subsequent schooling but repeatedly discontinued because of various personal interruptions. This has included her pursuing her GED as well. She reports to have basic reading skills which were briefly verified during this evaluation, confirming that she was able to appropriately read and comprehend self-report questions which were written at an eight-grade level. She states that her spelling is exceedingly poor but that she has relatively solid math skills. She has never attended any form of vocational or on-the-job training.

Tr. 567-68.

Dr. Gedney also summarized Plaintiff's reported "salient employment history":

"Employment efforts since 2008 have included applying for kitchen service work through

the local school board and for custodial work at the local Job Corps. She was declined

for both because of her physical limitations," not necessarily because of her mental

impairments. Tr. 568.

Dr. Gedney also reported the results of several tests, Tr. 570, which did not

specify the need for additional testing to determine Plaintiff's I.Q. or whether she was

---

[10]     During a July 6, 2007, mental health evaluation of Plaintiff, Ms. Duke, MSM, ACSW, summarized her mental status examination. Tr. 448; *see* Tr. 26 (ALJ reference to this evaluation, noting that "[t]he mental status examination was relatively benign, with the exception of a possible cognitive deficit."). Ms. Duke noted, in part, that Plaintiff has "[m]ild psychomotor retardation" and that she "[m]ay have some level of learning disability," but she did not ultimately recommend that Plaintiff be tested for mental illness or mental retardation. Tr. 450. Rather, she recommended that Plaintiff continue in outpatient mental health counseling; continue psychiatric treatment and take a prescribed medications; continue sobriety and monitor with random drug screens; and she deferred further substance abuse treatment recommendations pending her scheduled substance abuse evaluation. *Id.*

"severely mentally ill and possibly mental retarded," *see* ECF No. 22 at 16.[11]

On the other hand, Plaintiff's quest for disability benefits was supported by

Dr. Gedney.   Tr. 571.   He also recommended that Plaintiff continue services through

her community mental health services and concluded that "[a]n extended work

evaluation to help elucidate employment capacity is indicated given her substance use

history, reported debilitating pain and expressed discomfort interacting with others."   *Id.*

The ALJ's factual recitation is detailed and Plaintiff has not alleged or shown that

the ALJ committed any fact-finding errors based on this record, other than deciding the

case on an inadequate record.   The ALJ discussed the mental health evidence in the

record relating to the period at issue in this case, including Ms. Duke's July 6, 2007,

mental health evaluation, *see supra* at n.10, and Dr. Gedney's April 2012, initial

psychosocial evaluation, *see supra* at 16-20, 31-32.   Tr. 26.   The ALJ further noted the

Plaintiff's mental health impairments had been managed well with medications.

Tr. 26-27, 295, 317, 342, 505, 508, 535, 562.   *See* <u>Chereza v. Comm'r of Soc. Sec.</u>

<u>Admin.</u>, 379 F. App'x 934, 940-41 (11th Cir. 2010) (unpublished) (affirming finding of

non-severe impairments based in part because controlled with treatment).

The ALJ also considered Ms. Duke's July 6, 2007, reference to a possible

---

[11]    Dr. Gedney noted that in regard to the "Personality Style" test, that Plaintiff "is
very uncomfortable working in direct and close interaction with others, preferring instead
to be extremely self-reliant.   Her tendency to be very vigilant and questioning of the
motive of others may escalate to emotionally reactivity if she perceives that she is being
targeted or singled out in some way"   Tr. 570.   The ALJ included some of these factors
in her RFC by limiting Plaintiff to "avoid crowded work settings" and that she be "limited
to routine, uncomplicated tasks not requiring detailed decision making, not requiring a
production rate pace, and not requiring more than occasional work interactions with
coworkers, supervisors, and the public."   Tr. 24.

cognitive deficit, Tr. 26, 448. Yet, there was no persuasive evidence in this record that

Plaintiff was not capable of performing her past relevant work or other work described

by the vocational expert. Moreover, Ms. Duke did not opine that Plaintiff was mentally

retarded or needed additional testing to confirm or reject same. Tr. 450. As noted

above, the ALJ also referred to Dr. Gedney's April 4, 2012, evaluation and his estimate

that Plaintiff's intelligence was probably low average and that Plaintiff had at least basic

reading skills at the eight-grade level. Tr. 567-68. Like Ms. Duke, Dr. Gedney did not

diagnose Plaintiff with mental retardation or any other intellectual impairment such that

she was not capable of working as a result of her mental status as opposed to the need

for "[a]n extended work evaluation to help elucidate employment capacity given her

substance abuse history, reported debilitating pain and expressed discomfort interacting

with others," Tr. 571, issues not raised by Plaintiff, *see* ECF No 16.

Plaintiff further speculates that her education level might be a result of mental

retardation. ECF No. 16 at 13-14. Plaintiff reported to Ms. Duke to the contrary that

her mother pulled her out of school in the fifth grade to help her with her siblings.

R. 448; *see* Tr. 567 (Plaintiff reported to Dr. Gedney that "her mother removed her from

grade school after the fourth grade to help support the family following the death of her

father.").[12]

---

[12] To the extent Plaintiff focuses on her intellectual functioning, her argument is not persuasive because she had previously done the very work at issue. The ALJ found Plaintiff not disabled in this case because her past work comported with the ALJ's assessment of her functional capacity. Tr. 28. Plaintiff proposes that I.Q. testing was required because of her allegedly reduced intellect and minimal educational attainment, ECF No. 16 at 12-16, but she had worked as a housekeeper/maid, *see, e.g.*, Tr. 46, 194, 200, 271, 568, despite any cognitive and educational limitations, and the ALJ found

The ALJ was not required to further develop the record before reaching her conclusion that Plaintiff was less impaired than she claimed. "Under the social security regulations, the ALJ may order additional consultative examinations if the medical evidence submitted by the claimant does not provide enough information about an impairment to determine whether the claimant is disabled." Salazar v. Comm'r of Soc. Sec., 372 F. App'x 64, 67 (11th Cir. 2010) (unpublished) (citing 20 C.F.R. § 416.917). But "the ALJ is not required to order additional examinations if the evidence in the record is sufficient to allow [her] to make an informed decision." Id. (citing Ingram v. Comm'r of Soc. Sec., 496 F.3d 1253, 1269 (11th Cir. 2007)).

The ALJ considered numerous mental health examinations, treatment, medication efficacy, and some opinion evidence. The ALJ had sufficient information in the record on which to base an informed decision regarding Plaintiff mental health and her ability to work. There are not the kinds of evidentiary gaps in the evidence necessary to demonstrate "unfairness or 'clear prejudice'" to Plaintiff. Graham v. Apfel, 129 F.3d at 1423 (citing Brown, 44 F.3d at 934-35). No error has been shown.

## VI. Conclusion

Considering the record as a whole, the findings of the Administrative Law Judge are based upon substantial evidence in the record and she correctly followed the law. Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits be **AFFIRMED** and judgment

---

her not to be disabled based on her ability to perform prior work as a housekeeper, as actually and generally performed. R. 28.

entered for Defendant.

      **IN CHAMBERS** at Tallahassee, Florida, on October 19, 2015.

                    **s/ Charles A. Stampelos**_____
                    **CHARLES A. STAMPELOS**
                    **UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

      **A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.   A party may respond to another party's objections within 14 days after being served with a copy thereof.   Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**